IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Adam Fink,                          )
      Petitioner,                )
                                    )
    v.                              )          1:22-cv-37 (RDA/IDD)
                                    )
Harold Clarke,                      )
      Respondent.               )

**MEMORANDUM OPINION**

Adam Fink ("Petitioner" or "Fink"), a Virginia inmate proceeding *pro se*, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his September 26, 2016 convictions in the Circuit Court of Prince William County, Virginia for attempted robbery, malicious wounding, use of a firearm in the commission of a violent felony, attempted burglary, felony destruction of property, and carnal knowledge.  Respondent filed a Rule 5 Answer and a Motion to Dismiss alongside a supporting brief. [Dkt. Nos. 12, 13].  Fink was advised of the opportunity to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), in accordance with Local Rule 7(K), and he filed an opposition to the Motion to Dismiss.  [Dkt. No. 15].  Accordingly, this matter is now ripe for disposition.  For the reasons that follow, the Court has determined that Respondent's Motion to Dismiss must be granted, and the petition dismissed with prejudice.

### I. FACTUAL BACKGROUND

On February 6, 2014, thirteen-year-old C.R. was walking home from school and accepted a ride from an acquaintance, Michael Marshall.  Fink, who C.R. had never met before, and a man named Edgar Rios were also in the car.  [Tr. 8/31/2015 at 106-08].  Marshall did not drive C.R. home.  Instead, Marshall drove to his own house, where C.R. and the men began drinking. [*Id.* at

108].  C.R. went with Fink and Marshall to a store where Fink purchased beer.  [*Id.* at 159].  C.R. consumed one beer.  [*Id.* at 161].

Back at Marshall's home, C.R., Fink, and Rios walked to a shed where Fink and Rios offered to pay C.R. to have sex with other men.  [*Id.* at 109-10].  C.R. refused, but voluntarily accompanied them to a car.  Fink drove to an abandoned apartment building that C.R. had previously broken into, and she showed them how to enter the building through "the only open window in the whole apartment."  [*Id.* at 111, 171].  Once inside, one of the men grabbed C.R. from behind, held her down, and removed her jeans and underwear.  The other man behind her (either Rios or Fink) told her to be quiet.  One of the men got on top of C.R. and tried to have sex with her—which she refused—but the man ultimately engaged in vaginal sex with C.R. against her will.  The men then switched positions and the other man engaged in vaginal sex with her. C.R. did not remember in which order Rios and Fink had sex with her, or who had initially held her down.  Fink did not have a gun at this time. [*Id.* at 174].  The three then left the apartment complex together and C.R. voluntarily got into the car with them. [*Id.* at 112-15].  They stopped and got food, and then went by a house where Fink obtained a gun. [*Id.* at 174-75].

The three returned to the shed at Marshall's home and were joined by Michael Marshall, Thomas Marshall, and a man called "Esco."  The men talked about "jumping someone" and C.R. went with them as they left the shed headed for the Georgetown South neighborhood in Manassas. [*Id.* at 177, 180-81].  On the way, they stopped and ate.  [*Id.* at 188-89].

As the group walked through Georgetown South, they came upon a man standing outside of his house.  Fink pushed the man (Edwin Romero) against a wall and pointed a gun at his head. Rios, wearing brass knuckles, punched Romero.  [*Id.* at 116-17, 179-81].  On cross-examination, C.R. conceded that in her original statement to the police, given nine days after these events, she

said that Michael Marshall had the gun and pointed it at Romero.  [*Id.* at 186-87].  After Rios punched Romero, the group ran back to Fink's car and drove to a house owned by Denise Wells. [*Id.* at 120-21; Tr. 9/1/2015 at 62-63].  Rios broke a window in the back of the house, entered, and opened the door from the inside so that the group could enter.  [Tr. 8/31/2015 at 124-25, 182].  The group did a substantial amount of damage to the house.  [*Id.* at 125-29, 183-84].

The group left Wells' house and went to a second house in Georgetown South owned by Terry Ulsh and rented by Maria Umanzor and her family.  [Tr. 9/1/2015 at 98; 110-11].  The group attempted to enter the house by prying the rear sliding door open with a shovel, which caused a loud noise.  The group ran away when a dog inside the house began barking.  [*Id.* at 132-33].

Fink then dropped everyone off at their homes except Rios and C.R. and drove the car "back to the apartments."  The three went to "the same apartment," and Fink and Rios again engaged in vaginal intercourse with C.R. against her will.  During this incident, Fink pointed a gun at C.R. and Rios had a knife.  [*Id.* at 133-35].

## II. PROCEDURAL HISTORY

On September 3, 2015, Fink was convicted by a jury in the Circuit Court of Prince William County for six felonies: attempted robbery, malicious wounding, use of a firearm in the commission of a violent felony, attempted burglary, felony destruction of property, and carnal knowledge.  The circuit court sentenced Fink to a total sentence of 26 years in prison on September

22, 2016 and entered its final order on September 26, 2016.[1]  *Commonwealth v. Fink*, Case Nos. CR14-3163, -3164, -3168, - 3328, -3330, and -3621.[2]

A judge of the Court of Appeals of Virginia denied Fink's petition for appeal on September 28, 2017.  *Fink v. Commonwealth*, Record No. 0236-17-4.  [Dkt. No. 13-1].  The court concluded that Fink's assertion that the trial court erred by not allowing him to cross-examine the victim about her motive to fabricate was barred under Virginia Supreme Court Rule 5A:18 because counsel had not made an adequate proffer.  [*Id.* at 2-3].  The court rejected Fink's second and third assignments of error, finding the evidence was sufficient to support his convictions for the attempted burglary of Terry Ulsh's dwelling and the destruction of Ulsh's property.  [*Id.* at 4-6].  The court found Fink's last assertion of error, which alleged error regarding the correctness of the trial court's bystander liability instructions, was procedurally defaulted under Rule 5A:18.  [*Id.* at 6-7].  A three-judge panel adopted the September 28, 2017 order on December 4, 2017.  [*Id.* at 1].

Fink filed a petition for appeal in the Supreme Court of Virginia raising the first three assignments of error he had raised in the Court of Appeals.  The petition for appeal was refused

---

[1] Fink was sentenced to five years in prison for the attempted robbery of Edwin Romero; seven years in prison and a $25,000 fine for malicious wounding of Romero by mob; three years in prison for the use of a firearm in the attempted robbery of Romero; six months in jail and a $2,500 fine for the attempted statutory burglary of Ulsh's home; six months in jail and a $2,500 fine for the felony destruction of Ulsh's property; and, and ten years in prison for carnal knowledge of C.R.  (CCT at 438-39).

[2] Fink was arraigned on twelve indictments at the beginning of his trial. The jury acquitted him of the statutory burglary, grand larceny, and destruction of property indictments in which Denise Wells was the victim (Case Nos. CR14-3165, -3166, and -3169); rape, and use of a firearm in the commission of rape (Case Nos. CR14-3619 and 3620).  The use of a firearm in the commission of carnal knowledge (Case No. CR14-3622) was dismissed (9/13/15 Tr. at 33). Indictments for possession of a firearm by a non-violent felon and possession of ammunition by a felon (Case Nos. CR14-3126 and -3167) were terminated by the entry of a *nolle prosequie* after trial.  Seven other indictments involving gang participation were terminated by the entry of a *nolle prosequie* as well.  (Case Nos. CR14-3319 through -3325).

4

on October 17, 2018, and his petition for rehearing was denied on February 1, 2019. *Fink v. Commonwealth*, (Record No. 171673) ("VSCT").

On or about January 30, 2020, Petitioner, by counsel, filed a state habeas petition in the Circuit Court of Prince William County alleging his trial counsel was ineffective for:

1) Failing to cross-examine C.R. on her pending burglary charges to show motive to fabricate and bias;

2) Failing to cross-examine Maria Umanzor about her prior inconsistent statements that her door was broken before the alleged attempted burglary; and

3) Failing to object to the prosecutor's violation of the petitioner's invocation of his right to remain silent.

[Dkt. No. 13-2 at 9, 15, 16] (*Fink v. Clarke*, Case No. CL20-1261-00). The circuit court denied his state habeas petition by order entered August 3, 2020. [Dkt No. 13-3]. Fink, by counsel, filed a petition for appeal in the Supreme Court of Virginia. *Fink v. Clarke*, Record No. 201320. The Supreme Court of Virginia refused his petition for appeal on October 15, 2021. [Dkt. No. 13-4].

## III. FEDERAL PETITION

On or about December 13, 2021, Fink, proceeding *pro se*, filed the instant petition for writ of habeas corpus. He raises the following claims for relief:

I. The circuit court erred when it denied Fink's claim that trial counsel was ineffective under the Virginia Constitution and the Sixth Amendment of the United States Constitution because he failed to examine the key witness at trial, C.R., for motive to fabricate and bias based on her pending charges of burglary.

II. The state appellate court erred by affirming the trial court's ruling that Fink was not entitled under the Sixth Amendment to confront and cross-examine C.R. about whether she had a motive to fabricate the allegations against Fink due to an ongoing police investigation of C.R.'s involvement in a series of burglaries until C.R. "opened the door."

III. The circuit court erred when it denied Fink's claim that trial counsel was ineffective under the Virginia Constitution and the Sixth Amendment of the United States Constitution because he failed to cross-examine Maria Umanzor with her prior inconsistent statements indicating that her door had been broken prior to the alleged burglary.

IV.     The circuit court erred when it denied Fink's claim that trial counsel was
        ineffective under the Virginia Constitution and the Sixth Amendment of the
        United States Constitution because he failed to object to the prosecution's
        violation of Fink's invocation of his Fifth Amendment right to remain silent.

[Dkt. No. 1 at 17-18, 21-22].

## IV. EXHAUSTION AND PROCEDURAL DEFAULT

Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in
the appropriate state court.  *See* 28 U.S.C. § 2254(b); *Granberry v Greer*, 481 U.S. 129 (1987).
To exhaust a claim, a state prisoner "must give the state courts one full opportunity to resolve any
constitutional issues by invoking one complete round of the State's established appellate review
process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  A petitioner convicted in Virginia
must have presented the same factual and legal claims raised in his § 2254 petition to the Supreme
Court of Virginia.  *Kasi v. Angelone*, 300 F.3d 487, 501-02 (4th Cir. 2002); *see also Duncan v.
Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct
alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the
prisoners are asserting claims under the United States Constitution.  If a habeas petitioner wishes
to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed
by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

"A claim that has not been presented to the highest state court nevertheless may be treated
as exhausted if it is clear that the claim would be procedurally barred under state law if the
petitioner attempted to present it to the state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th
Cir. 2000) (citation omitted).  Importantly, "the procedural bar that gives rise to exhaustion
provides an independent and adequate state-law ground for the conviction and sentence, and thus
prevents federal habeas review of the defaulted claim." *Id.* (citation omitted).

Finally, exhaustion requires that not only must a claim be exhausted but "'both *the
operative facts* and the controlling legal principles'" upon which a petitioner relies must have been

6

exhausted as well to the state court for review.  *Kasi*, 300 F.3d at 501-02 (emphasis added) (quoting *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997)).  The requirement that facts be exhausted is an important aspect of exhaustion under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA limits federal habeas "review under § 2254(d)(1) … to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see Muhammad v. Clarke*, No. 1:11-cv-345, 2012 WL 259869, *4 (E.D. Va. Jan. 26, 2012) (holding that when a petitioner attempts to allege unexhausted facts, the federal court must defer to the state court's finding) (citing *Kasi*, 300 F.3d at 501-02 and *Pinholster*, 563 U.S. at 182-83), *appeal dismissed*, 474 F. App'x 979 (4th Cir. 2012).  *Pinholster* emphasized "that the record under review is limited to the record in existence at that same time—*i.e., the record before the state court*." *Id.* (emphasis added).[3]  The Fourth Circuit has held that the reasonableness of a state court decision is evaluated "'in light of the evidence presented in the State court proceeding.'" *Porter v. Zook*, 898 F.3d 408, 443 (4th Cir. 2018) (quoting *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015)).

Claims I, III, and IV are deemed exhausted because each claim was raised and then dismissed in the circuit court habeas proceeding, and Fink appealed the dismissal to the Supreme Court of Virginia.  Claim II, however, was raised in state court as an assignment of error on Fink's direct appeal of his criminal convictions, and the Court of Appeals found it was defaulted under

---

[3] *Pinholster* explained:

> [w]hat makes the consideration of new evidence strange is not how "different" the task would be, but rather the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed.  We cannot comprehend how exactly a state court would have any control over its application of law to matters beyond its knowledge.

563 U.S. at 183 n.3.

Virginia's contemporary objection rule—Rule 5A:18—and that judgment was summarily affirmed by the Supreme Court of Virginia.  [VSCT at 45].[4]  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (federal habeas courts should presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").  While exhausted, the application of Rule 5A:18 precludes federal review of the merits of Claim II.  *See Weeks v. Angelone*, 176 F.3d 249, 270 (4th Cir. 1999) (Virginia's contemporaneous objection rule is an adequate and independent state court procedural rule barring federal review of a claim because it is firmly established, and regularly and consistently applied) (citing Va. Sup. Ct. R. 5:25); *Kent v. Kuplinski*, 702 F. App'x 167, 169 (4th Cir. 2017) (applying Court of Appeals of Virginia's contemporaneous objection rule, Va. Sup. Ct. Rule 5A:18, to bar federal habeas review of a sufficiency of the evidence claim).

A petitioner may only overcome a state default by establishing cause and prejudice or a fundamental miscarriage of justice,  *See generally Martinez v. Ryan*, 566 U.S. 1, 13-15 (2012); *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991); *McNeil v. Polk*, 476 F.3d 206, 211 (4th Cir. 2007).  The existence of cause ordinarily turns upon a showing of (1) a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. *See Coleman*, 501 U.S. at 753-54; *Clozza v. Murray*, 913 F.2d 1092, 1104 (4th Cir. 1990).  Importantly, a court need not consider the issue of prejudice in the absence of cause.  *See Kornahrens v. Evatt*, 66 F.3d 1350, 1359 (4th Cir. 1995).

---

[4] Fink filed a petition for rehearing in the Supreme Court of Virginia arguing that the Court of Appeals had erred in finding that his assignment of error asserting he "had been denied his Sixth Amendment right to confront C.R." was defaulted.  Fink argued that because the trial court had refused "to let him ask questions about the burglary which were probative of a motive to fabricate C.R.'s accusations against him" his claim was not defaulted. [VSCT at 49].  The Supreme Court of Virginia summarily denied Fink's petition for rehearing. [*Id.* at 52].

However, to show "prejudice" for the cause and prejudice test, a petitioner must show an alleged constitutional violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Fink has not asserted cause and prejudice or a miscarriage of justice to overcome his default of Claim II. Accordingly, Claim II will be dismissed. In post-trial motions hearings on the issue of cross-examination of C.R., Fink produced no evidence that C.R. had been charged with any burglary crime, or that C.R. was aware of any investigation into her alleged involvement in any burglaries. [Tr. 8/31/15 at 102; Tr. 8/14/16 at 40-47]. Without evidence that C.R. was aware of any investigation, there could have been no claim that she had a motive to fabricate to avoid being charged in that investigation.

## V. STANDARD OF REVIEW

Under AEDPA, "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009). "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 20 (2013).

An unreasonable application of federal law is not the same as an incorrect application. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *accord Renico v. Lett*, 559 U.S. 766, 772-73 (2010). That is, the state court's judgment "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotations

and citation omitted); *see Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state decision is unreasonable application of federal law only if ruling so "lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement").

This "highly deferential standard ... demands that state court decisions be given the benefit of the doubt." *Renico*, 559 U.S. at 773 (internal quotations and citations omitted). "The required deference encompasses both the state court's legal conclusions and its factual findings." *Lenz v. Washington*, 444 F.3d 295, 299 (4th Cir. 2006). "[A] determination on a factual issue made by a State court shall be presumed correct." *Tucker v. Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). AEDPA also limits federal habeas "review under § 2254(d)(1) … to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 18. "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." *Green v. Johnson*, 515 F.3d 290, 299 (4th Cir. 2008); *see Schriro*, 550 U.S. at 473-74.

Claims of ineffective assistance of counsel are determined based on the highly demanding standard set forth for such claims in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the petitioner has the burden to show both that his attorney's performance was deficient and that he was prejudiced as a result. *See* Strickland, 466 U.S. at 687. The United States Supreme Court has characterized AEDPA deference in the context of "a *Strickland* claim evaluated under the § 2254(d)(1) standard" as "doubly deferential judicial review." *Knowles*, 556 U.S. at 123; *see also Woods v. Etherton*, 578 U.S. 113, 117 (2016). "[B]ecause counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment,' …. federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Id.* (citations omitted). "Section 2254(d) codifies the view that habeas corpus is 'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Valentino*, 972 F.3d at 581 (quoting *Harrington*, 562 U.S. at 102-03) (additional citation omitted).

*Strickland*'s first prong, the "performance" inquiry, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A federal court reviewing a habeas petition indulges a "strong presumption" that counsel's conduct fell within the "wide range of reasonable professional assistance." *Id.* at 689. The "basic lesson" of *Strickland* is that "judicial scrutiny" of counsel's performance must be "highly deferential." *United States v. Mason*, 774 F.3d 824, 828 (4th Cir. 2014) (citation omitted). Attorneys "are permitted to set priorities, determine trial strategy, and press those claims with the greatest chances of success." *Id.*

*Strickland*'s second prong, the "prejudice" inquiry, requires showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Valentino*, 972 F.3d at 580 (quoting *Harrington*, 562 U.S. at 86); *accord Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020). The question is whether the state court, which has "substantial 'latitude to reasonably determine that a defendant has not [shown prejudice],' still managed to blunder so badly that every fairminded jurist would disagree." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (quoting *Knowles*, 556 U.S. at 123).

11

Because the trial court's decision denying Fink's petition for writ of habeas corpus is the last state court opinion addressing his ineffective assistance of counsel claims, this Court "look[s] through" the Supreme Court of Virginia's refusal order to the reasoning of the trial court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018).[5]

## A. Claim I

Claim I alleges trial counsel was ineffective because he failed to "examine the key witness at trial, C.R., for motive to fabricate and bias based on her pending charges for burglary." [Dkt. No. 1 at 17]. The state court rejected this claim, found that Fink had not borne his burden to establish that trial counsel performed deficiently, and made the following findings of fact and conclusions of law:

> The alleged impeachment evidence involving the victim C.R. did not involve a conviction or charge for criminal activity, but merely police investigation into [C.R.'s] alleged involvement in certain burglaries;
>
> The defense could provide no admissible evidence of C.R.'s involvement in an investigation of burglaries;
>
> Although defense counsel said that C.R. was lying, there was never a clear proffer that it could be shown that she was lying;
>
> Even now there is no evidence that C.R. knew the police had been engaged in investigating her or even knew of any police investigation;
>
> Because there was no evidence to show that C.R. was aware of the investigation, there was no viable argument that she had a motive to fabricate to avoid being charged in that investigation;
>
> There was no evidence of an agreement between C.R. and the Commonwealth with respect to her alleged involvement in any burglaries;
>
> Use of the proposed impeachment evidence would have involved an effort to introduce inadmissible evidence of other crimes in the guise of evidence of bias;

---

[5] To the extent Fink alleges violations of the Virginia constitution, those allegations are not cognizable on federal habeas review. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

Claiming to show that C.R. was herself a burglar would have confused the jury about her role in the petitioner's crimes. The jurors would have had to follow an instruction limiting their consideration of such evidence to credibility and instructing them not to use it as propensity evidence;

Use of the suggested evidence would have injected collateral issues into the case which would have diverted the jury's attention from the real issue, the guilt or innocence of the accused;

C.R. was not the "star witness" and this case was not a one witness identification case;

A second victim provided significant and convincing testimony identifying the petitioner as the perpetrator;

Petitioner has not shown that his attorney was deficient in his performance of his duties under this claim.

[Dkt. No. 13-3 at 2-3]. The state court further found Fink had not shown *Strickland* prejudice:

[Fink] was identified as a participant in the three crimes involving E. R. by that victim himself and C.R.;

[Fink] had sent a letter to E.R. threatening him if he testified against [Fink];

There was no explanation for why C.R. would lie about [Fink's] participation in the various crimes;

Both [Fink and] C.R. testified that they had not met before and did not know each other before the day of the crimes[.]

[Dkt. No 13-3 at 4-5].

Choosing how to examine a witness is fundamentally a tactical matter and not subject to deeper analysis on review. *Sallie v. North Carolina*, 587 F.2d 636, 640 (4th Cir. 1974). Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available. *Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002), *aff'd*, 376 F.3d 520 (6th Cir. 2004). "[W]hich witnesses to call is a classic tactical decision left to counsel … and it remains a decision for counsel even when the client disagrees." *Id.*; *see United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008) ("[D]eciding what questions to ask a prosecution witness on cross-examination is a matter of strategy"); *see also United States v. Munoz*, 605 F.3d 359, 381 (6th Cir. 2010) (after impeaching

a witness, trial counsel was not ineffective for failing to use "every basis for undermining the [governments'] rehabilitation of" the witness and did "not render his re-cross constitutionally ineffective). Here, defense counsel attempted to and impeached C.R.'s testimony through cross-examination. [Tr. 8/31/15 at 153-198].

The record establishes that trial counsel successfully impeached C.R. for the sex offenses by establishing that her friend (Sovante) learned about the sexual intercourse between C.R. and Fink before C.R. went to the police and used that as the basis for a motive to fabricate argument. [8/31/15 Tr. at 193, 211-12]. Trial counsel also impeached C.R. with her prior statement that Michael Marshall, not Fink, had the gun during the assault and attempted robbery of Romero and emphasized that more than a week passed between the alleged offenses and when C.R. reported the matter to the police. [*Id.* at 186-87]. C.R. also admitted on cross-examination that when she talked to the officers, "she was getting [the] events all confused" and that she had to talk with someone to "straighten[] out the sequence of events in [her] mind." [*Id.* at 167]. Trial counsel also noted that Umanzor testified that the shovel C.R. identified as being used for the break-in was not the shovel actually used by the alleged perpetrators of the offense. [9/1/15 Tr. at 122]. Finally, although he did not question C.R. about being a suspect, Trial counsel argued without objection during closing argument that Romero had not identified C.R. as a member of the group that attacked him; C.R. was a runaway from February 6, 2014 through February 15, 2014; and there was no evidence that C.R. had been charged even though her conduct "fit[s] into some of the" offenses. [9/2/15 Tr. at 128, 129, 131].

Further, counsel pointed out that even though C.R. had been examined by a nurse after she went to the police, there was no testimony or pictures introduced that indicate she had been subjected to any force (cuts, scrapes, or bruises) as she had testified in describing the two incidents

of sexual intercourse [9/2/15 Tr. at 116]; and that like  everyone else she ran during the attempted robbery of Romero instead of staying put and extricating herself from the men that had allegedly raped her.  [*Id.* at 120].

Petitioner argues the state court decision was unreasonable.  He argues that even though the record did not establish that there was any evidence that C.R. was "not charged" with burglary or that she knew "that the police had been investigating her," counsel could have "asked any question on cross-examination that tends to show bias as long as there is a good-faith basis for asking the question." [Dkt. No. 15 at 1].  Fink inadvertently points out why his claim has no merit and ignores the import of the state habeas court findings—Fink, represented by counsel, failed to establish in state habeas that C.R. was either charged with burglary or knew that she was being investigated in connection with any burglaries.  In other words, he failed to demonstrate that C.R. was lying and had a motive to fabricate, and therefore trial counsel had no factual basis for the line of questions that Fink faults him for failing to develop.

Moreover, Fink not only failed to proffer at trial or in state habeas any evidence of C.R.'s concern about the alleged investigation, he has proffered none in this proceeding as well.  *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994) ("[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, 'a habeas court cannot even begin to apply *Strickland*'s standards' because 'it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiency in counsel's performance.'") (quoting *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991)); *Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir. 1990) (dismissing claims where petitioner failed to make a specific proffer of the testimony of the

omitted witness). In short, there is no evidence of the alleged bias or motive to fabricate, and trial counsel successfully impeached C.R. on several points at trial.

The state habeas court's dismissal of Claim 1 was not contrary to or "an unreasonable application of clearly established Federal law, as determined by the Supreme Court" or "based on an unreasonable determination of the facts in light of the evidence presented." *Long v. Hooks*, 972 F.3d 442, 457-58 (4th Cir. 2020) (en banc) (quoting 28 U.S.C. § 2254(d)). Claim 1 will be dismissed.

## B. Claim III

In Claim 3, Fink alleges trial counsel's cross-examination of Umanzor was ineffective because he did not ask her any "helpful questions," and he failed to impeach her "with her prior inconsistent statements indicating that her door had been damaged prior to the alleged burglary." [Dkt. 1 at 21; 1-1 at 17-18]. The state habeas court rejected this claim and concluded counsel's performance was not deficient for the following reasons:

> The victim of the attempted burglary and malicious destruction of property, Maria Umanzor, testified that up until the time of the crimes in February 2014 her back sliding door had been working before she discovered that it was damaged after the attempted break-in;
>
> The criminal group, including the petitioner and C.R., attempted to break into the home through the back sliding door using a shovel;
>
> In doing so they created a "really loud noise" which led a dog in the house to begin barking which caused the group to flee;
>
> The owner of the property became aware in February of 2014 that the door had been damaged and was replaced at a cost of $1,100;
>
> In her affidavit that victim says only that: "the back door was really old and she had asked for it to be changed." She had told the owner "that the door of the house was uneven, but not that someone had damaged it." She said that "[s]he told the police and everyone that the door was always old and damaged." (Id.);
>
> Testimony consistent with the witness' affidavit would not have precluded a jury finding that the door was damaged at the time of the attempted break-in;

The attorney was not ineffective for not presenting the suggested testimony by Ms. Umanzor or for not questioning her about her other statements and the petitioner can show no prejudice in light of the limitations of the proposed testimony;

The petitioner has not shown deficient performance under this claim[.]

[Dkt. No. 13-3 at 3].  The record supports the habeas court's findings and conclusion that Fink had not established a claim of ineffective assistance of counsel.

At trial, the issue with respect to the damaged sliding glass door (felony destruction of property) centered on the dollar value.[6]   If the dollar value was more than $1000, the charge was a felony; if less than $1000, it was a misdemeanor.  *See* Va. Code Ann. § 18.2-137.  C.R. testified that the group, including Fink, had attempted to break into Umanzor's home through the sliding back door using a shovel on February 6, 2014.  She testified that "[w]hen they were trying to get the door open with the shovel, it made a really loud noise.  I guess the dog heard it and then started barking.  That's when we all started running."  [Tr. 8/31/15 at 133].

Umanzor testified that in February 2014 she lived in a neighborhood known as Georgetown South at 9440 Taney Road, Manassas, Virginia, and that there was a sliding glass door on the back of the house.  [9/1/15 Tr. at 99, 109].  Umanzor also testified that prior to February 2014, the

---

[6] The statute reads as follows:

If any person who is not the owner of such property intentionally causes such injury, he is guilty of (i) a Class 1 misdemeanor if the value of or damage to the property, memorial, or monument is less than $1,000 or (ii) a Class 6 felony if the value of or damage to the property, memorial, or monument is $1,000 or more.  The amount of loss caused by the destruction, defacing, damage, or removal of such property, memorial, or monument may be established by proof of the fair market cost of repair or fair market replacement value.  Upon conviction, the court may order that the defendant pay restitution.

Va. Code Ann. § 18.2-137.  A Class 6 felony is punishable by "a term of imprisonment of not less than one year nor more than five years, or in the discretion of the jury or the court trying the case without a jury, confinement in jail for not more than 12 months and a fine of not more than $2,500, either or both."  Va. Code Ann. § 18.2-10(f).  Fink was sentenced to six months in jail and a $2,500 fine for felony the destruction of property. [CCT at 438-39].

sliding glass door had "shut and locked." [*Id.* at 100]. She had a dog at that time, which they kept inside the house, and there were two shovels in the backyard, a snow shovel and a "pointy" one. [*Id.* at 101, 103]. Upon returning home from work one day in February 2014, Umanzor discovered the sliding glass door was broken and needed to be replaced. [*Id.* at 100-01]. Umanzor described the damage to the door as "a separation between the door and the top rail," and that a person had to lift the door when closing the door. [*Id.* at 104-05]. She contacted the owner of the house about getting the door fixed, and had never given permission for anyone to enter her backyard or home while she was not home. [*Id.* at 105-06]. Terry Ulsh, the owner, testified that he became aware in February 2014 that the sliding glass door on the property had been damaged and that the cost to replace the door was $1,100. [*Id.* at 111-12]. The invoice was introduced as Commonwealth's Exhibit No. 7. [*Id.* at 112].

In state habeas, Fink's counsel proffered Umanzor's affidavit, which stated that "the back door was old and they had asked the owner to change it." [Hab. at 81].[7] The affidavit also included her averment that she had told the owner, "that the door of the house was uneven, but not that someone had damaged it," [*Id.*], and that "[s]he told the police and everyone that the door was always old and damaged." [*Id.*]. The affidavit does not state that additional damage did not occur in February 2014. As the state habeas court found, her trial testimony was not inconsistent with her affidavit and would not have precluded a finding that the door was damaged at the time of the attempted break-in.[8]

---

[7] The document submitted in state habeas is not sworn to by Umanzor but was deemed an affidavit by the state habeas court.

[8] During a post-conviction hearing before the final order was entered in his criminal case, Umanzor's prior inconsistent statement was addressed in the context of a failure to provide exculpatory evidence. The trial court denied the failure to disclose claim because trial counsel admitted the prosecutor had not only told him the door had damage prior to the attempted break-

As previously noted, impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective simply because in retrospect better tactics may have been available. *Millender*, 187 F.Supp.2d at 872; *cf. Dows*, 211 F.3d at 487 ("[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards"). "In hindsight, there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional ineffectiveness, few would be the counsel whose performance would pas[s] muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).

*Strickland* expressly cautions against viewing counsel's conduct in hindsight holding that "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 671. Here, trial counsel knew about Umanzor's prior inconsistent statement prior to trial, both from his own investigation and the later disclosure to him by the prosecutor before trial. At trial, however, during Umanzor's testimony on direct, unexpectedly, trial counsel obtained a point of impeachment evidence that he could use to impeach C.R. He chose to use the testimony to impeach C.R., whose testimony concerned several serious felonies, and not to impeach Umanzor whose testimony concerned a much lesser felony.

---

in, but that trial counsel had also learned of the prior damage from another source before the prosecutor told him of Umanzor's statement. During the argument on the motion, the prosecutor admitted that there was some damage to the door prior to the attempted entry on February 6, 2014, but that the testimony at trial established that the further damage that occurred on February 6, 2014 concerned the door's "operability," which required the replacement of "the door." [9/22/16 Tr. at 38].

During C.R.'s testimony on direct, she had identified Commonwealth's Exhibit No. 2A as a photograph of the shovel used in the attempt to pry open the sliding glass door at Umanzor's home. [8/31/15 Tr. at 131]. When asked about Commonwealth's Exhibit No. 2A on direct, Umanzor said that shovel was not in her backyard in February 2014. [9/1/15 Tr. at 101]. In closing, trial counsel used Umanzor's testimony about the shovel to impeach C.R. While trial counsel may have initially intended to impeach Umanzor with the prior inconsistent testimony at trial, he obtained the likely unanticipated benefit of a point he could use to impeach C.R., and it was not unreasonable to forego impeaching Umanzor on one of the lesser charges for which Fink was on trial, in order to use a prosecution witness to impeach C.R. It is evident from the trial record that defense counsel focused his efforts on impeaching and challenging C.R.'s credibility and Umanzor's testimony became part of his arsenal. *See Sallie*, 587 F.2d at 640; *see also United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature" and do not ordinarily support an ineffective assistance claim); *Hoots v. Allsbrook*, 785 F.2d 1214, 1219 (4th Cir. 1986) ("[C]ourts considering a claim of ineffective assistance should not second-guess strategic decisions of counsel"); *Higgs v. United States*, 711 F. Supp. 2d 479, 515 (D. Md. 2010) ("Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types of tactical decisions a court is not supposed to second guess.").

The state court concluded that Fink had not shown *Strickland* prejudice because he had been identified as the participant in the crimes by both Romero and C.R., the record demonstrated that Fink had sent a letter to Romero threatening him if he testified against Fink, that there was no explanation for why C.R. would lie about Fink's participation in the crimes, and that C.R. and Fink

had not met before and did not know each other before the day of the crimes.  [Hab. at 22-23].

The state court's disposition of this claim was not contrary to, nor did it involve an unreasonable

application of, clearly established Federal law and it did not involve an unreasonable application

of the facts.

## C. Claim IV

In Claim 4, Fink alleges his trial counsel was ineffective because he did not "object to the

prosecution's violation of Fink's invocation of his Fifth Amendment right to remain silent."  [Dkt.

1 at 22].  The state court rejected this claim and found counsel did not perform deficiently for the

following reasons:

> The only authority cited in the petition was overruled by *Salinas v. Texas*, 570 U.S.
> 178, 181 (2013);
>
> The petitioner presents no authority for the claimed Fifth Amendment violation;
>
> The petitioner cannot demonstrate that the attorney erred by not objecting for the
> reason he suggests;
>
> All the cross-examination of the petitioner by the Commonwealth involved pre-
> *Miranda* silence;
>
> When the officer was questioned about post-*Miranda* responses from the petitioner,
> defense counsel, rather than objecting, elicited on cross-examination, for the first
> time, that the *Miranda* warnings had included a right to remain silent;
>
> All the testimony of the petitioner's post-*Miranda* statements merely repeated the
> petitioner's pre-arrest statements that he had no intention of speaking to the police
> without a lawyer;
>
> Defense counsel made clear to the jury that the petitioner before his post-*Miranda*
> statements had been told that he had a right to remain silent;
>
> A reasonable attorney could well have believed that objections to the questioning
> of the officer would have emphasized the petitioner's persistent refusal to talk to
> the police before and after his arrest;
>
> The attorney's decision not to object was reasonable under the facts of this case.

[Hab. at 22].

The Fourth Circuit has stated that "[w]ell-settled law prohibits states from using a

defendant's post-*Miranda* silence to impeach that defendant's testimony providing an exculpatory

version of the events in question.  However, states may use a defendant's pre-*Miranda* silence, whether it occurred before or after arrest, to do so."  *Buckner v. Polk*, 453 F.3d 195, 208 (4th Cir. 2006) (citations omitted).[9]

During his cross-examination of Fink at trial, the prosecutor focused primarily on the letter that Fink had written to Romero and the issue of witness intimidation.  [9/1/15 Tr. at 155-88].  The prosecutor asked four questions about Fink's direct testimony that the police had not contacted him about the incident and that he knew the police had contacted his father and others about the incidents.

> Q:      …. So you say you never spoke to the police about this?
>
> A:      Never.
>
> Q:      Yet, you weren't there. Why didn't you tell the police that?
>
> A:      They never came and questioned me.
>
> Q:      You are charged with all these serious crimes and you didn't think to tell the police that?
>
> A:      I didn't do anything so I figured I wouldn't even be arrested. I spoke to my father about it.
>
> Q:      Ok. And so you hadn't contacted the police to tell them the names of anyone that could say where you were at the time to establish an alibi?
>
> A:      No. I would have contacted a lawyer before that.

---

[9] *Buckner* explained that

*Doyle [v. Ohio*, 426 U.S. 610 (1976)]; made clear that, while the state could not use the defendant's post-*Miranda* silence to impeach his exculpatory testimony, it nevertheless could use such evidence to impeach his testimony that he had not been silent at a particular time.  426 U.S. at 619 n.11.  *Fletcher [v. Weir*, 455 U.S. 603, 607 (1982)] and *Jenkins[ v. Anderson*, 447 U.S. 231 (1980)] later held that *Doyle*'s prohibition on the use of post-*Miranda* silence does not apply to pre-*Miranda* silence. 4 55 U.S. at 607; 447 U.S. at 241.  Because the prosecutor's closing argument used Buckner's pre-*Miranda* silence to impeach his exculpatory testimony, we find that the prosecutor's remarks during closing arguments did not violate the Fifth Amendment.

453 F.3d at 208.

(*Id.* at 184-85).  In context, it is evident that the prosecutor, as found by the state habeas court, was asking about  Fink  not contacting the police about the incident before his arrest even though he knew the police had contacted his father and others.

In rebuttal, the prosecutor called Sgt. Ryan Pavol, who testified that he read Fink his *Miranda* rights on May 9, 2014 after his arrest and asked Fink about what occurred on February 6, 2014.  Fink responded that he did not "want to talk to" them.  [*Id.* at 197].  On cross-examination, trial counsel clarified that the *Miranda* rights included the right to remain silent and that Fink had exercised that right.  [*Id.* at 198].  In closing argument, the prosecutor did not refer to the testimony about not speaking to the police prior to his arrest or Pavol's testimony.  The prosecutor instead emphasized the note Fink admitted he had sent to Romero.  [9/2/15 Tr. at 141-43].

With the exception of Pavol's testimony, the record supports the finding that the prosecutor's questions to Fink and Fink's answers concerned pre-*Miranda* conduct.  Trial counsel was not ineffective for objecting to the prosecutor's questions on his cross-examination of Fink because those questions concerned pre-*Miranda* silence.  *See Buckner*, 453 F.3d at 208

The direct examination of Pavol concerned what Fink said after he was advised of his *Miranda* rights about the incidents that occurred on February 6, 2014.  Fink exercised this right to remain silent by telling Pavol he did not want to talk with him.  Pavol's testimony was short and neither side commented about it during closing.  Assuming for the sake of argument that Pavol's testimony on direct is a *Doyle* violation, it is isolated.  Pavol was a rebuttal witness the prosecutor had not anticipated calling and the trial was slightly delayed while Pavol was in transit to the courthouse.  The direct examination ended abruptly and accomplished nothing, which is borne out by the fact the prosecutors did not mention it in their closing argument.  Given the context in which the post-*Miranda* silence issue arose at trial, it is understandable that trial counsel did not draw

23

any attention to it by objecting. *See Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006) ("experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner").

"The Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim," *Engle v. Isaac*, 456 U.S. 107, 134 (1982), and "[c]onstitutionally effective assistance does not require the assertion of every possible valid objection. Indeed, it is frequently better to remain silent rather than to draw attention to the matter." *Hansford v. Angelone*, 244 F. Supp. 2d 606, 613 (E.D. Va. 2002) (citing *Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir. 1977) (courts should refrain from second guessing the tactical and strategic decisions made by trial lawyers)); *Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) ("A competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would"); *see, e.g., Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989) (rather than draw further attention to the evidence, defense counsel instead chose to attack the credibility of the relevant witnesses during argument, which is a tactical decision that "attorneys make routinely"); *Moore v. United States*, 934 F. Supp. 724, 727 (E.D. Va. 1996) (it is often better for a defense attorney "to remain silent than to draw attention to a matter by offering an objection. Courts, too, recognize counsel's autonomy in strategic trial behavior"); *see also Dodson v. Stephens*, 611 F. App'x 168, 176 (5th Cir. 2015) (it is entirely reasonable for a state habeas court to conclude that counsel's failure to object to objectionable testimony "would do more harm than good" because "an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of objection may be more prejudicial than the original remarks"); *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011) (state

court's decision that counsel's decision not to draw "undue attention" to brief testimony through an objection was reasonable trial strategy and was not an unreasonable application of *Strickland* because there is "no constitutional rule that counsel must make, or not overlook, every possible objection to unfavorable testimony") (citation omitted); *Gardner v. Ozmint*, 511 F.3d 420, 428 (4th Cir. 2007) (holding a state post-conviction court's determination that defense counsel's failure to object to testimony to avoid drawing attention to the testimony was not in effective assistance of counsel was an unreasonable application of "or contrary to clearly established Supreme Court precedent").

The state court's disposition of this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law and it did not involve an unreasonable determination of facts.  Whether to object to testimony at trial is a matter of trial tactics, which is afforded great deference under *Strickland*.  *See Humphries v. Ozmint*, 397 F.3d 206, 234 (4th Cir. 2005) ("[H]ere we owe compounded deference to trial counsel's decision [of whether to object to evidence]: we defer to the [state] court's highly deferential review of trial counsel's performance. And, the deference that trial counsel must be afforded under *Strickland* is appropriately extensive, because appellate courts are poorly suited to second-guess trial strategy and on-the-fly decisions of trial counsel").  Furthermore, "it is well established that failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under *Strickland*."  *Id.*; *see also United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006) ("not drawing attention to [a] statement may be perfectly sound from a tactical standpoint"); *see also Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2009) ("It is well established in federal jurisprudence that a

lawyer's "'strategic choices ... are virtually unchallengeable.'"). The record also establishes the alleged violation did not prejudice Petitioner's defense.[10]

### VI. Conclusion

For the foregoing reasons, respondent's Motion to Dismiss [Dkt. No. 12] will be granted. An appropriate Order and judgment shall issue.[11]

Entered this 19th day of January, 2023.
Alexandria, Virginia

_____ /s/

Rossie D. Alston, Jr.
United States District Judge

---

[10] The only authority cited by Fink for objecting to testimony regarding his pre-*Miranda* silence was the Sixth Circuit's decision in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). The Sixth Circuit recently observed that *Combs* discussion of the invocation of the privilege against self-incrimination invoked in that case, where defendant was not yet in custody, was "*dictum*." *United States v. Meadows*, 822 F. App'x 434, 440 (6th Cir. 2020). *Combs* is also inconsistent with the United States Supreme Court's subsequent ruling in *Salinas v. Texas*, 570 U.S. 178, 181 (2013). A district court in the Sixth Circuit noted that "the Supreme Court overruled *Combs* and held that prosecutors could use pre-arrest silence as evidence of guilt . . . . Accordingly, the Sixth Circuit held that it could not consider counsel's failure to object because it would be futile under then-current law." *Polini v. Litteral*, No. 3:14cv689, 2019 WL 236721, at *3 (W.D. Ky., Jan. 15, 2019) (citing *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014)), *aff'd in part, vacated in part, remanded by*, 981 F.3d 486 (6th Cir. 2020).

Given the limited exchange on this point at trial, trial counsel could have easily decided that he did not want to draw further attention to the point that he had already shown was nothing more than an exercise of his rights. Additionally, the testimony (that Fink did not want to talk to the police) was cumulative to his pre-*Miranda* statements.

[11] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.